# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**LISA A. DEAN,**

                Plaintiff,

                                       **Case No. 07-C-492**

        **-vs-**

**JAMES PARKER, FLOYD MITCHELL,**
**GARY MITCHELL, CHRISTY DIETZ, and**
**COLLEEN HANSEN,**

                Defendants.

---

# DECISION AND ORDER

---

Lisa Dean ("Dean") is a former correctional officer and shift captain at the Milwaukee Secure Detention Facility ("MSDF"). The focus of Dean's case is her allegation that defendant James Parker ("Parker") continually harassed her during her employment at MSDF. Dean alleges claims for harassment based on her gender and her association with an African-American co-employee. Dean also alleges claims for retaliation and constructive discharge. Because the defendants are (or were) employees of the Wisconsin Department of Corrections, these claims are brought pursuant to 42 U.S.C. § 1983.

The defendants moved for summary judgment. After reviewing the initial round of summary judgment submissions, the Court ordered additional briefing on the following issues: (1) whether Parker's alleged harassment of Dean was committed while acting under color of state law; (2) whether the additional defendants (Floyd Mitchell, Gary Mitchell, Christy Dietz and Colleen Hansen) can be held liable for Parker's alleged harassment as

supervisors under § 1983; and (3) qualified immunity. Upon review of the initial and supplemental briefs, the Court concludes that defendants' motion must be granted-in-part and denied-in-part.

## BACKGROUND

Mr. Parker is a former DOC employee who at all times relevant was a sergeant at MSDF. As a sergeant, Parker's job duties included directing the work of other correctional officers such as Dean. By definition, a DOC sergeant directs, assigns and reviews the work of other correctional officers on a work unit or shift. Parker had no authority to hire, fire, promote, suspend, recall, lay off or discipline employees. The Correctional Sergeant position Goals and Worker Activities allots 5% of time to the direction of correctional officers as a lead worker. Parker's position was higher in rank than Dean's, and Dean was in a position where she would be required to follow orders given by Parker. Parker gave others at DOC feedback on Dean's work.

Mr. Floyd Mitchell ("Fl. Mitchell") was employed at MSDF as the Intake Captain from April 2003 to December 2003, as Administrative Captain from April 2004 to April 2005, and Security Director from May 2005 to February 2006. Mr. Gary Mitchell ("G. Mitchell") was employed as a Captain at MSDF from February 2001 until October 2006. Ms. Dietz was the MSDF Security Director from August 2000 to April 2005. Ms. Hansen is employed as the MSDF Human Resources Director. She has held this position since October 2001.

-2-

As applicable to MSDF, Executive Directive 7 is the DOC policy prohibiting harassment and hazing in the workplace. The directive states that any allegation of harassment or hazing which comes to a supervisor's attention must be investigated and that all incidents will be met with counseling or appropriate discipline. All DOC employees receive training on the requirements of the harassment policy.

Under Executive Directive 5, any employee who believes they are the object of harassment or hazing should first attempt to resolve the problem directly with the offending party. If the problem cannot be resolved, they are to bring their complaint to the attention of their supervisor. Complaints may also be filed with DOC Office of Diversity and Employee ("ODES"). A formal Employee Discrimination Complaint should be filled out and submitted to Human Resources, after which it is sent to ODES. The ODES handles employees' employment discrimination complaints under DOC's internal employee discrimination complaint policy and procedure, and also handles harassment complaints, including sexual harassment, made by employees.

Dean started working at MSDF in October 2002. On Ms. Dean's first day, she was told by a sergeant on the fourth floor (Sergeant Gabor) that his purpose at MSDF was to fuck the female correctional officer that was on his floor, and in fact, that she was in his bed right now. Ms. Dean verbally complained about this conduct, but no action was taken that she knew of. Throughout the first couple years Ms. Dean worked at MSDF, various male officers made inappropriate comments to her.

-3-

Dean and Parker started working together in 2003. Parker started making inappropriate comments to Dean. He said that Ms. Dean was more beautiful than the other female officers and gave her compliments in an exaggerated way. Dean thought that Parker was trying to make social inroads with her, sitting next to her in the Pod and saying things like, "You're beautiful," and "You're an excellent officer."

Parker would often play jokes on Dean, like asking her to look out the window only to find that there was nothing there, while he would be staring at her body and laughing. Parker would also ask Dean to turn around while making a movement with his index finger indicating that he wanted her to turn around in a full circle. She thought he was checking her uniform, but he would just stare at her body and laugh. Parker would always do this when the other officers were not around.

Dean once noticed Parker standing only inches behind her while she was eating lunch, and he was looking down her shirt. He then walked away giggling. Dean recalls early in her career at MSDF voicing her concern with Parker's behavior to the administrative captain, and he said to shut up or transfer.

One day, Dean was conducting the afternoon inmate count at 12:30 p.m. when the television volume in the recreation room was turned up very loud. Dean radioed to Parker asking him to turn off the television so she could continue the inmate count. Parker refused to turn off the television and continued to ignore Dean while he read a magazine in the officer station. Dean was forced to finish the count while the television was at a very loud volume. When Dean told Parker that he could have turned off the television, he said "If it

-4-

was so noisy out there you should come back in the fucking bubble and waited until it was quiet!"

In October of 2003, Dean was showing some selected staff members pictures of her vacation with her fiancé, Mr. Purtue. Purtue is an African-American who was also a correctional officer at MSDF. Once Parker saw pictures of Mr. Purtue, he made many inappropriate comments to Dean. He asked if she was really going out with that guy and why would you ever date someone like that in an upset tone. He also asked, "You're gonna listen to that guy [Mr. Purtue] before me?" Then he started calling her a "nigger lover" and raising his voice. He then threw a chair across the room. Dean did not want to show the pictures to Parker, but did so because she was afraid of what Parker would do if she refused.

Parker acted shocked once he found out that Dean was dating Officer Purtue. He started to single her out, saying that she couldn't do her job. Parker constantly called her a "social worker" – a pejorative name for a staff member that cares too much for the inmates. Parker also told Dean, "About 70% of staff at MSDF would not make it in a real institution. Dean, you would never make it at Green Bay. Those fucking rednecks would eat you alive!" At times, Parker would get extremely upset and throw a chair in Dean's direction. One time, the chair hit the chair Dean was sitting on.

Parker called the inmates "fucking nappy headed bastards," "crop pickers," "fucking niggers," and "fucking trash" to their faces or he would refer to the inmates by those names while inside the officer station. Parker would often tease the inmates by putting them in segregation so that they would lose special privileges that they had obtained. Dean told

-5-

Parker several times to stop harassing her, but he continued. Parker told Dean that he only wanted male officers working on his unit.

Dean was uncomfortable around Parker, so she hardly ever went where he was in the officer station. Instead, she would stay on the floor just to avoid harassment from Parker. Parker would often insult Dean in front of the inmates, which would undermine her authority. Parker often said that Dean was a poor employee and gave her more tasks that were outside of her job responsibilities, while he allowed male employees to sleep and do nothing.

Officer Steinhoff was a male officer who worked under Parker. Officer Steinhoff was allowed to sleep on the post and leave the floor for hours without question. Officer Steinhoff would ask the inmates if their cells were clean at the officer station window instead of conducting cell searches and inspections, which the proper protocol requires. Officer Steinhoff would also conduct inmates' counts from inside the bubble and not walk the tiers for count, which the proper protocol requires. Ms. Dean conducted the proper searches and inmate counts, yet Parker always found something wrong with her work, and never criticized Officer Steinhoff.

Parker would make Dean do the same job over again, because he thought it would be funny. He would often not update the count boards before she conducted the inmate counts, so she would have to correct the count boards and do the inmate count over again. Sometimes, he would ask her to repeat the count several times loudly to his satisfaction, and then he would laugh at her.

-6-

Dean began taking on the job duty of updating the count boards and updating the files of inmates and their movements. This was not her job duty, but Officer Steinhoff was always sleeping and Parker was usually off the pod, so they did not take care of it. She eventually stopped taking care of this because her job was to be on the floor. She complained to the unit manager, Kelly Quarles, about her work environment but nothing was done. After she complained, Dean saw Parker talking to Mr. Quarles in the hallway outside of the officer station. Once they were finished talking, Quarles came into the officer station and asked her why she wasn't doing her job. As Quarles accused her of not doing her job, Parker was reading his muscle magazine and ignoring his own job duties. Once Quarles left the officer station, Parker laughed at Dean.

Parker would play with the doors on the Unit where he and Dean were assigned and not let Dean into the officer station. Sometimes he would hang up the phone while she was in the middle of a phone call. Otherwise, if Parker allowed Dean to finish her telephone conversation, he would ask her who she was talking to or ask Officer Steinhoff what she said during the telephone conversation.

Parker constantly told Dean that she was the problem in his unit and ordered her to get off his unit. Parker would tell her that everyone hated her and would call her names like "fucking moron," "inmate lover" and "nigger lover." When he would say these things, Dean would usually remain quiet and not say anything back to him. Sometimes she would respond by saying "stop harassing me" or "leave me alone."

-7-

Dean's fiancé/boyfriend, Officer Purtue, would call her during the day to make sure she was okay. Sometimes Parker would hang up the phone on Officer Purtue or not tell Dean that Officer Purtue called. On occasion, the Health Services Unit ("HSU") would call Dean in reference to an inmate and Parker would tell them he didn't need them or he wouldn't pass on their message to Dean.

While Dean was inside the officer station, Parker would put the camera on her and before 7:30 a.m., he would tell her to get out on the floor. As he was ordering her onto the floor, Officer Steinhoff was in the pod sleeping or reading muscle magazines with Parker.

In April 2004, Parker intercepted a telephone conversation Dean was having with Health Services, in which Dean was requesting medical attention for an inmate. Parker interrupted this phone conversation and told HSU that they did not need to visit the inmate. He then yelled at Dean saying that she was not allowed to call HSU without permission. During this incident, Parker said "If it wasn't for the Purcellis and Paasches and the Deans, life would be so much easier."

Later that same day, Dean noticed that six inmates were in the recreation room, when only five are supposed to be in that room at one time. She decided to shut down the room because none of them would leave voluntarily. Parker returned to the unit and harassed Dean about closing the recreation room without his permission.

Around 1:15 p.m. that same day, Dean told Parker that she noticed an inmate did not eat breakfast or lunch for the last two days. Dean told Parker he might want to log that in the log book. Parker said, "I don't give a fuck! Why don't you call HSU? Maybe he's not

-8-

hungry Dean, didn't you think of that or don't you think? Maybe you should call HSU and tell them!" Parker told Dean to write up an incident report for him.

At 1:30 p.m. that same day, an inmate came to the office station and asked for a nail clippers. Dean told the inmate to fill out a request form. Parker screamed at Dean as the inmate gave her his request form, "Who told you to do that? That's the stupidest thing I've ever heard." As Dean gave the inmate the clippers, she told Parker that he was the person that told her to have inmates fill out request forms and she thought it was a good idea to keep track of who had the clippers. Parker again yelled at Dean, saying "Don't put words in my mouth Dean! Now I know you are crazy! I would never say that!" Dean responded, "Parker, I think you forget what you say to me. I thought it was a good idea when you told me to do that when you first came on the unit." Parker said, "You need help! I always knew you were crazy!" Dean stated, "Stop it! Stop talking to me. You don't make any sense. Leave me alone and let me do my job!"

On April 25, 2004, Dean was observing breakfast when she noticed an inmate limping. The inmate told Dean that he had pain in his knee and had already filled out several HSU slips and had also told Parker that he needed to see a nurse. Dean went into the officer station and called HSU. Parker yelled at her saying, "We don't call for inmates, they fucking fill out HSU slips!" As the dayroom opened, the inmate came over to the officer station and asked if he could see a nurse today. Parker screamed at the inmate, "Fill out a fucking HSU slip and get away from the fucking window." A nurse came to the unit to tend to the inmate.

At the same time, another inmate came over by Dean and said he had blood and puss coming out of his ear and also told her that he previously informed an officer and filled-out a HSU slip. Dean asked the nurse if she wouldn't mind seeing this inmate as well. The nurse saw that he had a badly infected ear and ordered antibiotics and gave him a box of aspirin. Throughout the rest of the day, Parker mocked and harassed Dean for calling HSU.

In the spring of 2004, Dean tried to set up a meeting with defendant Dietz, the security director, to discuss Parker's conduct. Dean indicated that she was going to bring a witness, but Dietz cancelled the meeting unexpectedly.

In May 2004, Parker refused to give Dean the keys to the bathroom unit that was outside the unit. This caused her to defecate in her pants since she could not get access to the bathroom.

Also in May 2004, Parker asked Dean to work on another unit so that Parker could work with one of his friends, Officer Regalia. Dean refused, and Parker said "All you do is whine, Dean. That's why no one wants to work with you. Quarles doesn't want you up here, I don't want you up here, and no one wants to work with you." This occurred after Dean had made several complaints about Parker's behavior and misconduct, of which Parker was aware.

On May 11, 2004, Parker asked Dean if she could switch pods the next day. Parker stated that he felt uncomfortable working with her and that he was going to call the captain to have her placed on the north side. Parker then accused her of being insubordinate and told her that her work performance left something to be desired. She said, "No, Parker, it's

-10-

because you have created a hostile work environment and you continue to harass me even though I've told you to stop it." Parker said, "You think it's harassment whenever a guy talks to you, Dean. Nobody wants you up here. I'm calling the captain to get you off my unit! We don't want you up here!"

On May 24, 2004, Dean met with Quarles, G. Mitchell and Purtue to discuss her complaints of harassment. Dean had been documenting incidents with Parker, and she gave her notes to Quarles. After the meeting, Quarles interviewed a handful of other officers in the course of his investigation. Despite these reports, Quarles and defendant Dietz concluded that Parker's conduct did not amount to harassment. Other officers stated that Dean had trouble following Parker's directions, which created tension between the two of them. Quarles recommended that Parker receive progressive discipline for violation of DOC work rule A 13, "Intimidating, demeaning or using abusive language in dealing with others." There is no indication in the record that such discipline was ever imposed. Parker and Dean were enrolled in mandatory sensitivity training. Parker never attended, while Dean attended but learned nothing and thought it was useless.

Female officers working under Sergeant Parker made similar complaints about him. Other women at MSDF complained of being mistreated by Sergeant Parker, including Ms. Singleton and Officer Paasch. Parker would tell Ms. Singleton inappropriate things, such as that he knew that he could get black women. Ms. Browder stated that Sergeant Parker had difficulties dealing with females in the workplace. According to Ms. Jacobson, Parker had issues with females in authority.

-11-

On August 3, 2004, defendant Hansen wrote to plaintiff, on the MSDF warden's behalf, regarding her inquiry into the investigatory status of her complaint against defendant Parker. Hansen advised her that an investigation had been conducted, that complaints of harassment were taken seriously, and that appropriate action had been taken.

On August 5, 2004, Dean took time off work to seek medical attention due to harassment at work. Dean was diagnosed with irritable bowel syndrome in 2004 because of a constant nervousness she felt at work. Dean filed an Employee Workplace Injury or Illness Report, in which she stated that she was seeking medical treatment because she was being harassed by staff. She said that she would miss four or more days from work and that she might have job restrictions as a result of this harassment.

When filing an Employee Workplace Injury or Illness Report, a statement by the supervisor needs to be attached attesting to the injury. This report then goes to Human Resources or the payroll benefits specialist who is handling Worker's Compensation to make sure that the claim is reported within 24 hours. Then, the Worker's Compensation staff at the Department of Administration looks over the report. Three or more people looked and were involved with Dean's report and no one reported, investigated, or attempted to terminate this campaign of harassment that was serious enough to cause Dean to go to the doctor and miss work.

On August 16, 2004, Dean sent a memo to defendant Hansen explaining that she didn't think the investigation of Parker and his record of harassing others at work had been done thoroughly. Dean alleged that MSDF had not taken her complaint seriously.

-12-

On August 23, 2004, Dean filed a discrimination complaint with the Equal Rights Division of the Dept. of Workforce Development, alleging that five MSDF employees had discriminated against her on the basis of her sex and race.

In August 2004, Fl. Mitchell was assigned to investigate an incident that occurred on July 31, 2004 between Dean and Sgt. Angelina Smith, who engaged in a verbal confrontation. Fl. Mitchell determined that the allegations in Dean's incident report were not fully supported. Fl. Mitchell recommended that no further action be taken and neither Dean nor Smith was disciplined because they were working overtime, stress levels were high, and the issues were compounded by a building water failure.

Dean did receive discipline for a variety of other incidents. For example, on August 25, 2003, Dean received a written job instruction for lack of professionalism when dealing with the public after she criticized local hospital emergency room staff regarding the level of medical care they were providing an inmate who Dean was supervising on a medical trip. Dean commented to nurses that "she would not bring her dog there to get treated." On February 27, 2004, Dean received a written job instruction for a January 16, 2004 incident where she and Officer Dyson got into a loud and heated verbal confrontation. Dean ignored lead officer Dyson's directives to return an inmate to the housing unit during the count procedure and Dyson threatened Dean with bodily harm. On February 18, 2004 Dean received a letter of reprimand for refusing a superior's order to immediately return a set of leg irons that she had unintentionally taken home on February 3, 2004.

-13-

In September 2004, Dean decided to transfer to another post by placing her name and seniority on a "Notice of Transfer Opportunity." She accepted the position of Relief Officer 16 on September 27, 2004 and began working in the position on October 17, 2004. In the interim, on September 25, 2004, Mr. Vopal deemed the situation between Parker and Dean hostile enough to switch Dean from 9D to 9A so she did not have to work with Parker. Vopal also recommended and allowed for Dean to switch with other officers so she did not have to work with Parker.

On September 28, 2004, Denise Symdon, Assistant Administrator of the Division of Adult Institutions, wrote to Dean in response to a letter sent by Dean complaining that her harassment complaint was not properly addressed. By copy of the letter, Symdon referred Dean's letter to Kathy Angell of the ODES for review. Dean phoned Ms. Angell to talk about her complaint and "went off on her" because she was having a bad day.

On October 1, 2004, Ms. Angell wrote to Dean informing her that she had reviewed Dean's complaint and the findings of the MSDF investigation with which she concurred. Angell also advised Dean of the other agencies with whom she could file her complaint if she was dissatisfied with the ODES investigation. However, Dean had already filed her complaint with ERD prior to receiving the results of the ODES investigation.

Even after Dean transferred to a different post and was no longer working with Parker, she continued to complain about him by writing incident reports that were always marked "continued harassment." The subject of these complaints generally concerned comments

-14-

Parker had made to Dean that she perceived as harassment. There was follow up on each of these incident reports and no disciplinary action resulted.

Parker also began writing incident reports about Dean. Most of Parker's complaints centered on Dean's refusal to take direction from him or recounted derogatory comments she made to him in passing. Parker began writing up complaints on Dean because he was being investigated for harassing her every other week. He was getting hang-up phone calls at his home in the middle of the night after one of her complaints had been investigated and dismissed, and his wife naturally had questions. By this time, Parker felt that Dean was baiting him into making comments that she would then report as harassment. Parker even reported that Dean was soliciting other staff to write incident reports against him, although Dean denies this assertion. There was follow up on each of these incident reports and no disciplinary action resulted.

When a MSDF employee completed an incident report they were to sign and date the report and submit it to a supervisor – a lieutenant or a captain. The reviewing Supervisor has the initial responsibility to take or schedule action steps to investigate the report's allegations and then note on the incident report summarizing those steps prior to forwarding it for the the Security Director's review and signature. Once Dietz reviewed the report and action of the supervisor, she would sign off on the report and it would be logged into the institution database for recording.

-15-

There are well over a thousand incident reports and over a thousand conduct reports that come through the Security Office for review and signature.[1] All conduct reports, written by staff reporting inmate misbehavior were also logged into the system and reviewed by the Security Director or designee. There are any number or reasonable actions a supervisor could have taken to investigate allegations of an incident report. For example, security camera videotape could be reviewed, witnesses and the complainant interviewed to name a few. Often times, the supervisor would conduct these investigations and simply state "no further action taken" without memorializing the steps taken before forwarding the report to Dietz's attention. Each situation is unique and different, with mitigating circumstances. This in no way means that the allegations reported were ignored.

Having reviewed supervisor investigations of Dean's complaints, Dietz recalls that more often than not her allegations were unsubstantiated by witnesses, and review of videotape, log book notes, and other investigative sources. Because Dean and Parker had a history of filing incident reports against one another, Dietz would have recommended that if Dean had made the allegation that someone talk to her and proceed from there. It often comes down to one person's word over another's, placing the supervisor in a tough spot to determine who instigated the incident, whether both parties were culpable, whether it was just a personality conflict, or whether there was more to the allegations than disclosed.

In January 2005, Parker saw Dean in the parking lot and said, "You really are crazy." He was following Dean as she was walking to her car alone in the parking lot. G. Mitchell

---

[1] The record is silent as to the timeframe for this volume of reports.

reviewed the incident report and conducted an investigation. There are security cameras located at the institution entrance door and in the parking ramp where staff parked. G. Mitchell reviewed the videotapes of each camera which showed Dean and Parker leaving the institution and entering the parking ramp, and saw no evidence of any verbal exchange. G. Mitchell interviewed Dean, who stated that there were no witnesses and she could not recall the names of any staff or officers in the area at the time. Dietz also reviewed the incident report and did not take any corrective action against Parker.

G. Mitchell claims that he tried his best to separate Dean and Parker because he knew of the dispute between them. Regardless, on January 11, 2005, G. Mitchell assigned Dean to work with Parker, and Dean refused the assignment. G. Mitchell reprimanded Dean for her refusal to work with Parker, wrote a letter of notice describing her refusal as "insubordinate" behavior and threatened her with further discipline.

On December 20, 2005, Parker went into the segregation unit while Dean was temporarily assigned there. When Dean asked what he was doing there, Parker said "I can hang out wherever I fuckin' want to." Dean wrote an incident report, describing Parker's conduct as "continued harassment." However, nothing on paper memorializes any kind of action that was taken.

On December 30, 2005, Parker came into the elevator core with trays for 9 South and said to Dean, "Are you going to write this up too, bitch?" and then left.

-17-

On February 25, 2006, Dean and Parker got into a heated verbal altercation regarding how many meal trays were needed for Unit 9. Both Dean and Parker wrote incident reports, a full investigation followed, and no disciplinary action was taken against either party.

In February 2006, Fl. Mitchell met with Dean to follow-up on her continued complaints about Parker. Fl. Mitchell informed Dean that Parker had filed a report against her alleging that she was soliciting staff to write incident reports complaining about Parker. Dean stated that she had notes to show that on one occasion Fl. Mitchell "blew his top" and became "red in the face" when she informed him she would be going home sick if directed to work on the same unit with parker. Fl. Mitchell told Dean that was not that case and that it has never been his demeanor to blow his top. Dean accused him of lying and stated that she had it written in her notes.

On April 15, 2006, Parker said to Sergeant Abrams, in Dean's presence, "I can't wait to get out of here so I can get away from a few fuckin' psychos," clearly referencing Ms. Dean. Dean filed an incident report. Once again, nothing is memorialized on paper that something was done – either an investigation or disciplinary action.

On April 26, 2006, G. Mitchell asked Ms. Purcelli to call Ms. Dean to her office and have Dean re-write an incident report. As Dean was waiting in the hallway to see Ms. Purcelli, Parker passed Dean and called her a "nut job" and swore at her. Dean was shocked that Purcelli and other staff allowed Parker next to her after all the harassment he had subjected her to. Dean voiced her concerns to Purcelli, who apologized for Parker's presence

-18-

and said that she did not know he was there. Dean said, "You know this crap's been going on for two-and-a-half years now, and I am sick of it."

G. Mitchell walked into Purcelli's office, and asked if Dean had re-written the incident report from earlier that day. Dean did not know what G. Mitchell was referring to. G. Mitchell then yelled at Dean saying she had to re-write the incident reports or he threatened not to investigate the conduct. Dean refused to re-write the report because it was already adequately submitted. Dean asked if G. Mitchell was going to investigate Parker's conduct, and G. Mitchell said "He was not going to investigate anything."

G. Mitchell then told Dean that she could not leave Purcelli's office and he told Purcelli to make sure Dean did not leave. G. Mitchell threatened Dean that if she left the office, she would be fired immediately. G. Mitchell left the office and told Dean not to move until he came back.

Dean called Mr. Purtue from Ms. Purcelli's office. While she was waiting for Mr. Purtue to come, G. Mitchell came back and told Dean that she could not leave. Dean said that she needed a union representative and began to leave, but G. Mitchell blocked her access out of the office, screaming at her that she could not leave. He then yelled at her saying, "If you leave this room, you will be fired!" G. Mitchell reported what had transpired to the deputy warden and the HR assistant, who in turn contacted the warden.

G. Mitchell returned with Sgt. Ackley and Officer Gondert and delivered a letter to Dean from Deputy Warden Robert Gaither that placed her on administrative leave with pay pending the outcome of an investigation regarding her inappropriate behavior with Lt.

-19-

Purcelli and G. Mitchell. Dean was then escorted out of the building by the officers. An investigation was never conducted because Dean went on medical leave one day after her suspension with pay, and subsequently resigned in July 2006.

On April 27, 2006, Dean filed for a Harassment Temporary Restraining Order with the Circuit Court of Milwaukee County against Parker. The TRO was eventually dismissed when Dean failed to appear for the hearing.

## ANALYSIS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## I.    Harassment

There are four general elements for a harassment (or hostile work environment) claim: (1) the plaintiff must be the object of unwelcome harassment; (2) the harassment must be based on race, gender, or any other protected characteristic; (3) it must be sufficiently severe or pervasive so as to alter the conditions of employment; and (4) there must be a basis for employer liability. *See Bellino v. Peters*, 530 F.3d 543, 551 (7th Cir. 2008). A claim for

-20-

gender-based harassment is actionable as an equal protection claim under § 1983.  *See Bohen v. City of E. Chicago, Ind.*, 799 F.2d 1180, 1185 (7th Cir. 1986).[2]

To determine whether harassment is "severe or pervasive," courts consider a variety of factors, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating as opposed to a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.  *See Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998).  This test involves both a subjective and objective component.  *See Wieland v. Department of Transp.- State of Indiana*, 98 F. Supp. 2d 1010, 1020 (N.D. Ind. 2000).  The objective standard focuses on the environment's effect on a reasonable person; the subjective standard focuses on the environment's actual effect on the particular employee.  *Id.* (citing *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1272 (7th Cir. 1991)).  The subjective component is not at issue, so the Court will confine its analysis to the objective inquiry.

Regarding the objective inquiry, the "line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other" is thin.  *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000).  "On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures.  On the other side lies the occasional vulgar

---

[2]  The standard of proof is essentially the same as a Title VII claim.  *See Murray v. Chicago Transit Auth.*, 252 F.3d 880, 887 (7th Cir. 2001).  The main difference is that the defendant must "intend to harass under equal protection . . . but not under Title VII, where the inquiry is solely from the plaintiff's perspective."  *King v. Bd. of Regents of Univ. of Wisconsin Sys.*, 898 F.2d 533, 537-38 (7th Cir. 1990).

banter, tinged with sexual innuendo, of coarse or boorish workers." *Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006) (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)).

Viewing the evidence in the light most favorable to Dean, the Court finds that this case falls on the actionable side of the spectrum. The sheer volume of incidents between Dean and Parker over a lengthy period of time (approximately 2 ½ years) suggests that they were not isolated incidents, but rather were occurring on a regular basis. Some of the confrontations between Dean and Parker could be seen as no more than harmless horseplay. However, much of the conduct crosses the line in terms of severity. For example, there were numerous incidents during which Parker screamed obscenities at Dean. On some occasions, Parker's behavior was physically threatening, like when he would throw a chair in Dean's direction. This goes beyond the situation where a supervisor or coworker merely "fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor." *Minor v. Ivy Tech State College*, 174 F.3d 855, 858 (7th Cir. 1999). Parker's alleged conduct towards Dean was often threatening and amounted to an unreasonable interference with her work performance.

Defendants attempt to characterize the dispute between Dean and Parker as one arising from personal animus. Defendants note that Dean responded to the harassment from Parker in kind, leading Parker to file his own complaints against Dean. Defendants also provide evidence that Dean was involved in incidents with other employees. This evidence may have some relevance at trial. However, it does not preclude, as a matter of law, the

-22-

conclusion that Parker's actions towards Dean were motivated by gender-based animus. For example, Parker appeared to take offense when Dean rebuffed his advances and discovered that she was dating a different correctional officer. Some of his outbursts towards Dean were laced with comments betraying gender-based animosity (*e.g.*, referring to her as a "social worker," asking "are you going to write me up too, bitch?"). Even if the dispute was partially motivated by personal animosity (especially the latter portion), there is too much evidence in the record suggesting that Parker harassed Dean because she was female for Dean's claim to be dismissed on summary judgment. *See, e.g., Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98-99 (2003) (Title VII plaintiff can introduce either direct or circumstantial evidence to show that a protected characteristic was a motivating factor in an adverse employment action).

## II.    Under color of law

As the Court implied in its order for supplemental briefing, the final element of a Title VII harassment claim – basis for employer liability – does not apply in a § 1983 case against state employees. Dean may not obtain monetary relief from her employer because the State of Wisconsin (and the DOC by extension) is immune from suit and is not a "person" for purposes of § 1983. *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 64 (1989); *Joseph v. Bd. of Regents of Univ. of Wisc. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005). In other words, liability "falls on the misbehaving employees" who are sued in their individual capacities. *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007).

-23-

However, to hold the defendants liable under § 1983, the alleged wrongdoing must be "taken under color of state law." "Action is taken under color of state law when it involves a misuse of power, 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Honaker v. Smith*, 256 F.3d 477, 484 (7th Cir. 2001). Acts by a state officer are not made under color of law unless they are related in some way to the performance of the duties of the state office. *See Walker v. Taylorville Corr. Ctr.*, 129 F.3d 410, 413 (7th Cir. 1997). Not all torts committed by a state employee constitute state action, even if committed while on duty. *See Bonenberger v. Plymouth Tp.*, 132 F.3d 20, 24 (3d Cir. 1997).

The color of law analysis is complicated by the fact that Parker was not Dean's supervisor in a traditional sense. Parker could not fire or demote Dean. However, this is not dispositive of the "color of law" inquiry. "The essence of section 1983's color of law requirement is that the alleged offender, in committing the act complained of, abused a power or position granted by the state." *Bonenberger*, 132 F.3d at 24. In the context of sexual harassment, "liability under the Equal Protection Clause . . . in the workplace is predicated upon some authority that the wrongdoer has over the victim. Otherwise, it is difficult to establish that the abusive action was perpetrated 'under color of state law' rather than as an essentially private act of sexual harassment." *Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir. 1992).

Parker's position as a sergeant correctional officer gave Parker a certain measure of authority over Dean. He could direct, assign and review Dean's work, and he exercised this

-24-

authority on various occasions (*e.g.*, uneven distribution of job assignments, refusing to give her the bathroom keys, threatening to transfer her to another unit). Most importantly, Dean was required to follow Parker's orders. When she resisted, the alleged harassment often escalated. Therefore, there is a genuine issue of fact as to whether Parker's harassment of Dean was related to his duties as a sergeant. *See, e.g., Bonenberger* at 23 ("state employee may, under certain circumstances, wield considerable control over a subordinate whose work he regularly supervises, even if he does not hire, fire, or issue regular evaluations of her work").

Similar to their argument that Parker was motivated by personal animus, the defendants attempt to characterize Parker's harassment of Dean as a private act of sexual harassment. Private motivation is not enough to remove harassment from the umbrella of state action. For example, in *Walker*, 129 F.3d at 413, the Seventh Circuit found that the defendant acted under color of state law when she sexually assaulted an inmate. The incidents were possible "only because [the defendant] had access to [the inmate] in his cell and in the shower as a result of her official position. Whether or not she then took the alleged actions 'in pursuit of her own interests,' she was able to do so solely because of the position of authority she enjoyed." *Id.* at 413-14.

Parker was in a position to exploit his authority with respect to Dean, even if he was also acting in pursuit of his own interests. *See, e.g., Murphy v. Chicago Transit Authority*, 638 F. Supp. 464, 467-68 (N.D. Ill. 1986) ("a person acts 'under color of state law' when he engages in conduct that is related to state authority conferred on the person, even though that

-25-

authority does not in fact permit the conduct"). Therefore, his private motivation does not preclude a finding that he acted under color of state law.

## III. Supervisor Liability

In order to recover damages against a state actor under § 1983, a plaintiff must show that the actor was "personally responsible for the constitutional deprivation." *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 614 (7th Cir. 2002). There is no vicarious liability in this context, so the remaining defendants – Floyd Mitchell, Gary Mitchell, Christy Dietz and Colleen Hansen – must have "had some personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct." *Id.* at 614-15. "Supervisors who are simply negligent in failing to detect and prevent subordinate misconduct are not personally involved. 'Rather, supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference.'" *Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997) (citations omitted).

Each of the aforementioned supervisory defendants had some role in responding to or investigating Dean's numerous complaints against Parker. There is no dispute that each of these defendants had actual knowledge of the ongoing conflict between Dean and Parker. The defendants argue generally that the deliberate indifference standard cannot be satisfied because all of Dean's complaints were investigated in some manner. This does not preclude a finding, as a matter of law, that the defendants acted with reckless indifference towards Dean's complaints. It is entirely possible that the supervisory defendants paid lip service to

-26-

Dean's complaints but did not take them seriously. On the other hand, Dean argues that the deliberate indifference standard is satisfied because Parker's harassment continued in spite of her repeated complaints. This argument goes too far in the opposite direction. The mere continuance of the alleged harassment does not create an issue of fact that, in hindsight, the supervisory defendants ignored Dean's complaints.

This case falls somewhere in the middle of those extreme positions, but the Court finds that it falls closer to a finding of deliberate indifference. Prior to the Dean-Parker confrontations, other female co-workers complained about harassment from Parker, yet Parker was not disciplined. *See* Plaintiff's Proposed Findings of Fact, ¶¶ 215-256. Additionally, despite Dean's repeated complaints, Parker was never seriously disciplined. In one instance, Unit Manager Kelly Quarles recommended progressive discipline for Parker's use of abusive language towards Dean, yet it is unclear whether any discipline was imposed. It may be that discipline was not warranted, but if discipline *was* warranted and not imposed, this would permit a finding of deliberate indifference. *See, e.g., Valentine v. City of Chicago*, 452 F.3d 670, 684 (7th Cir. 2006) (material issue of fact as to supervisor liability where defendant received complaints regarding harassment and responded inadequately, such as by simply telling the perpetrator to stop without transferring him).

## IV.    Retaliation

Dean alleges that she was retaliated against for her complaints of harassment. Title VII prohibits employers from punishing employees for complaining about discrimination, but this is not a Title VII case. Therefore, Dean attempts to bring her retaliation claims under

-27-

the Equal Protection Clause. This she cannot do. *See, e.g., Boyd v. Illinois State Police*, 384 F.3d 888, 898 (7th Cir. 2004) ("the right to be free from retaliation may be vindicated under the First Amendment or Title VII, but not the equal protection clause") (collecting cases). Even if Dean brought her claims under the First Amendment, they would be insufficient as a matter of law because her speech did not involve a matter of public concern. *See Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 973 (7th Cir. 2000) (citing *Connick v. Myers*, 461 U.S. 138, 146 (1983)); *Gray v. Lacke*, 885 F.2d 399, 411 (7th Cir. 1989) (no First Amendment claim because plaintiff's harassment complaints to her supervisors "related solely to the resolution of a personal problem").

## V.     Constructive Discharge

Although this claim is not clearly alleged in the complaint, Dean argues that she was constructively discharged. To establish a claim for constructive discharge, a plaintiff must prove that unlawful discrimination made her working conditions so intolerable that a reasonable person would be forced to resign. *See Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). Generally, to support such a claim, a plaintiff's working conditions must be even more egregious than the high standard for hostile work environment claims because, in the ordinary case, an employee is expected to remain employed while seeking redress. *See Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). The term "'constructive discharge' refers to the situation in which an employer, without firing an employee, makes [her] working conditions so miserable that it drives [her] to quit." *Hunt v. City of Markham*,

-28-

219 F.3d 649, 655 (7th Cir. 2000).  The inquiry is objective, not subjective.  *See Suders*, 542 U.S. at 141.

Dean resigned from her employment, but only *after* she was forcibly removed from MSDF and placed on administrative leave.  Dean endured a harassing work environment for two and one half years, then quit two months after being extricated from that environment.  *See, e.g., Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994) (in order to constitute constructive discharge, harassment must be intolerable *at the time of the employee's resignation*).  A reasonable employee in Dean's situation would not feel compelled to resign by her working conditions because Dean was not subject to hostile conditions – or *any* working conditions –  while she was on administrative leave.  Therefore, Dean cannot state an actionable claim for constructive discharge.

## VI.  Qualified immunity

Government officials performing discretionary functions are shielded from damage liability insofar as their conduct does not violate clearly established statutory or constitutional rights.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  It was clearly established in the Seventh Circuit since at least 1986 that sexual harassment under color of law in the workplace constitutes gender discrimination in violation of the equal protection clause.  *See Nanda v. Moss*, 412 F.3d 836, 844 (7th Cir. 2005) (citing *Bohen*, 799 F.2d at 1185).  Therefore, the defendants are not entitled to qualified immunity on Dean's claim that she was harassed at work by Parker because of her gender.[3]

---

[3] The standards on supervisory liability were also clearly established.  *See Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988).

Case 2:07-cv-00492-RTR   Filed 11/25/08   Page 29 of 31   Document 62

However, Dean also alleges that she was harassed by Parker because of her relationship with Officer Purtue, an African-American correctional officer at MSDF. This right was not clearly established in the Seventh Circuit at the time the alleged harassment occurred. *See Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005) (collecting cases) (this circuit has not "definitely ruled on whether discriminating against a person because they are involved in an interracial relationship constitutes race discrimination in violation of Title VII,[4] although the Fifth, Sixth, and Eleventh Circuits have held that it does"). Therefore, defendants are entitled to qualified immunity on Dean's claim for harassment based on her interracial relationship.

---

[4] While this is an Equal Protection case, the analysis generally mirrors the Title VII analysis when applied in an employment context.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1.      The defendants' motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**, consistent with the foregoing opinion; and

2.      The Court will initiate and conduct a telephonic scheduling conference on **December 16, 2008** at **9:30 a.m. (CST)**, the purpose of which will be to set this matter for trial on the Court's calendar.

Dated at Milwaukee, Wisconsin, this 25th day of November, 2008.

**SO ORDERED,**

*s/ Rudolph T. Randa*
**HON. RUDOLPH T. RANDA**
**Chief Judge**

-31-